All right, you can call the first case. Case number 11-1081, People v. Levante Adams. Good morning, Your Honor. Good morning. May it please the Court, my name is Deborah Pugh, and I represent the petitioner Levante Adams. I'd like to reserve a few minutes, maybe five minutes, for rebuttal. All right. Mr. Adams merely wants to get into the door of the circuit court. All he's asking here is for leave to file his successive post-conviction petition. And under the new standards articulated in People v. Edwards, he should be allowed to file the petition. Edwards made clear that leave to file a successive petition should be denied, only where it is clear that based on the petition and the supporting documents, so taking the documents is true and looking only at them, that as a matter of law, the petitioner cannot set forth a colorable claim of actual innocence. And it is well established that actual innocence involves evidence that is newly discovered and material and conclusive. So the questions are, is it new? Could it change the results on retrial? Taking Adams' pleadings as true, Adams can and does set forth a claim of actual innocence, and he should be permitted to file his petition. Adams presents three affidavits from new eyewitnesses. These eyewitnesses not only exonerate Adams, they actually implicate a different assailant. And as a matter of law, they set forth a claim, a colorable claim of actual innocence, in that they're both new and would change the outcome at retrial. So I have a question. How is this new evidence not cumulative? Well, it's not cumulative because it's, although it corroborates what Adams testified to at trial, but it's definitely not cumulative because what, this evidence is very much like the evidence that the Illinois Supreme Court looked at in Ortiz in 2009, where there was a crime that was committed. The defendant testified that he wasn't there. Adams said that he left the scene, the murder occurred, he later found out about the murder. And then as in Ortiz, there were witnesses who came forward who said, I saw the murder, the defendant wasn't there, this is new evidence. But weren't some of the first witnesses that testified at the trial saying the same thing? Some of the first at Adams' trial? Yes. At Adams' trial, there was some evidence that was implicating him coming from his brother and his brother's girlfriend, and then a lot of the other evidence was saying he was there, and then some of that evidence was impeached by grand jury testimony. And so this is really a very new sort of counter-narrative to what was presented by the state, saying that we saw this person named Mike or this person with braids. There was nothing presented at trial that would implicate another assailant because Adams' take on the story throughout has been that he simply wasn't there and he doesn't know what happened. So we have these three new affidavits from Muhammad Williams, Teada Williams, and Bridget Rush, two of them saying that somebody named Mike was the actual assailant, one of them saying that it was a man with braids who was not Adams, and Adams was bald, and all three of these petitioners, or all three of these affiants, know Adams either personally or by sight. And so at trial, Adams said that he was not the one who committed the crime, that he doesn't know what happened, that he left and he found out that the murder occurred. And there was evidence that implicated him, but again, this is a strong counter-narrative that corroborates Adams' testimony and is not cumulative because it's really presenting new evidence and it's very much like what happened in Ortiz where it's somebody coming forward saying, I saw what happened, it wasn't the defendant. And so to go into the affidavits a little bit, the first one is from someone named Muhammad Williams. Now Muhammad Williams knows Adams by sight but doesn't know him personally. He said that he was driving by on Wolcott Street on Adams' mother's street on the night of the murder. He saw a man with braids beating someone with a bat. He didn't see Adams. He didn't go to the police, he said, because he didn't know who the assailant was. And then he moved to California. He knew that Adams had been arrested, but he didn't go to the police because he thought that he didn't have any new information that would be helpful. Then when he moved back from California, he discovered that Adams had been convicted. He had thought that he would get in trouble if he went to the police then for not coming forward sooner, so he didn't come to the police then, but only later he decided that he was keeping an innocent man in prison and that he should come forward. The next affidavit is from someone named Tiada Williams, no apparent relationship to Muhammad Williams. And she was walking on Wolcott that night. She was walking down the street and she saw someone that she knew by the name of Mike hitting a woman with a bat. She was scared of Mike. She was afraid that Mike would kill her if she came forward, and so she didn't. She didn't see Adams that night. Now later on, she ran into Adams' son and the son's mother and realized that she should come forward to try to exonerate Adams, knowing that he wasn't the person who had committed the crime. The third affidavit is from a woman named Bridget Rush. Now Bridget was at Adams' mother's house that night, and Adams knew that she was there. She was inside the house when she heard an argument outside. She saw Adams' mother go and tell Adams to go home or to leave, and then Adams hopped into his car and drove away. Now still on the street then were Terrence, Adams' brother who implicated him at trial, and the victim, Rama Baker. They were arguing. Also on the street was Terrence's friend Mike, and Mike then beat Rama Baker with a bat. Terrence threatened Bridget Rush and said that he would kill her if she talked to the police or implicated him or Mike. And so prior to trial, both the police and Adams tried to talk to her and tried to learn what her story was, tried to find out what, if anything, she had seen, and she wouldn't talk to anyone. She didn't cooperate with either side. And so nobody knew what she had seen. And she said that she's coming forward now because it's the right thing to do. So these affidavits present facts that are newly discovered and that are both material and cumulative. They're newly discovered, so these three affidavits really fall into two different categories. There's the Mohammed and Tiata category and the Bridget Rush category. The Mohammed and Tiata affidavits are really classic actual innocence affidavits in that these are very much like Ortiz. These are people that Adams would have no reason to know had any information about the crime, and he would have no reason to know that he should be questioning them. He didn't know that they were there. The defendant was sort of reliant on them to come out of the woodwork and report what they had seen. And so these Mohammed and Tiata are very much like the affidavits in Ortiz in that they saw the crime. They didn't report anything. They came forward and said that Adams wasn't there. Excuse me, but how is Ms. Rush's testimony new since she states in her affidavit that she was there on the night with the defendant's mother in the house and identified some of the other witnesses, individuals that were later on, were witnesses at the trial? So how is her evidence new? Newly discovered, you mean? Yes. It's newly discovered because Adams didn't know what she had actually seen. He knew that she was there that night, but neither side really had any information from her. He didn't know if she was still there at the time of the murder. He didn't know if she had seen anything. He had no idea what she had seen. She was definitely a potential witness, absolutely, but she wasn't necessarily a true eyewitness because neither side knew what she had seen. So the best that anyone could do would be to subpoena her on a fishing expedition, but she wasn't even cooperating at all. She was afraid, and so she didn't come forward. So it's a different category, definitely, for Muhammad and Tiyadak, where Adams had no reason to know that they had seen anything. He did have reason to suspect that perhaps Bridget had some information, but if she wasn't cooperating, the only thing he could do would be to go to subpoena her on a fishing expedition, which neither the state nor Adams did. And so they sort of waited for her to come forward now, after all this time, to say what she had seen. And so her evidence is in a different category, but it is still newly discovered, whereas Tiyadak and Muhammad's is very much like that, like the affidavits in Ortiz, where newly discovered came forward for very similar reasons. Muhammad came forward after having moved out of state, as did the Ortiz. Affiant and Tiyadak coming forward after running into Adams' family. So you're defining newly discovered here based on the defendant not knowing of Ms. Rush's testimony? Is that how you're defining it? With Bridget Rush, again, her affidavit's in a different category, because he didn't know. I mean, he knew that she was at the house. He definitely knew that, but because he wasn't there at the time of the murder, that he wouldn't know if she was still there, if she had left by then, if she had seen anything, if she wasn't talking. There was just no way for him to learn what she had seen, if she had seen anything. And he did try to talk to her, and the state tried to talk to her. Both sides did. And she didn't tell the police anything. She didn't tell Adams anything. And so she was sort of just this black box that was not explaining anything until she came forward now. And so the evidence is not just newly discovered. It's also material and conclusive. The Illinois Supreme Court in Molstad in 1984 indicated that, looking at new evidence, what the court should do is to consider how the new evidence would shift the strength of each side. And what we have here is a very strong counter-narrative to what the state had presented at trial. The state presented eyewitnesses who implicated Adams, and now we have eyewitnesses who are not only implicating Mike, but also suggesting that Terrence, one of the key witnesses against Adams, was actually involved as well and was threatening witnesses and making him much more involved than he presented himself to be at trial. And this is also like Ortiz again. To quote Ortiz, Ortiz said that the new testimony in that case, quote, supplied a first-person account of the incident that directly contradicted prior statements of the eyewitnesses. That's precisely what we have here. We have new first-person accounts that directly contradict what the state put forward at trial. Now the state, in their brief, says that these new affidavits are not material. The state says that they actually contradict Adams' testimony. This isn't true. Adams testified that he drove away, argued with the victim, drove away, learned later that she was murdered. So he drove away, then she was murdered. That's precisely what Bridget Rusch attested. She said that they argued, Adams drove away, the victim was murdered. That is exactly what she said. And as far as Tiad and Muhammad, they said that they both happened to come down the street at the time of the murder. Apparently it was quite crowded based on some of the witness testimony. There was a lot going on on the street. They happened to go by, saw the murder, didn't see Adams. That is exactly on all fours with Adams' testimony, that he wasn't there at the time of the murder. There's no reason that they would have seen him. They're not saying we were hanging out there for 15 minutes, a half hour, an hour beforehand.  There's no reason they would have seen Adams. In fact, it would have been directly contradictory to Adams' testimony if they had seen him, because he said that he wasn't there at the time of the murder. But doesn't Muhammad Williams in his affidavit say that he doesn't really know the defendant, Mr. Adams? Yes, he doesn't know him personally. I think that they played basketball together. He knew him by sight, and so he knew who he was from the neighborhood but didn't know him personally. So he would have recognized him. So then on one occasion when they played basketball, he knew exactly whether or not it was Mr. Adams. It's unclear how often they played basketball together. I think many neighbors know each other by sight but don't know each other personally and would recognize each other. Also, the person that he saw had braids. I've never seen a photo of Adams where he wasn't bald. He's been bald consistently from arrest through his current IDOC photos. And so the person that he saw, whether he could say that he saw Adams or not, he definitely knew that the assailant was not Adams, and he didn't see somebody who he thought would have been Adams based on his previous interactions with Adams or viewings of Adams. Now these new affidavits are material and conclusive not just because they exonerate Adams but because they are implicating somebody else. Adams' brother had a strong reason not to implicate himself in this, and now we have affidavits who are implicating Mike, Terrence's friend, saying that Terrence was threatening them, that they were afraid of Mike and they were afraid of Terrence, and that's why they're coming forward. It's also interesting to note that there was no physical evidence tying Adams to this crime, which would have been an extremely bloody crime. The state's evidence was that she was bludgeoned to death with a bat, and the story that the state presented was that Adams beat her to death with a bat and immediately hopped into his car. But the state presented no evidence of any DNA, nothing from the victim found in his car, on his person, on his clothes, and so even though this crime would have been extremely bloody, there was nothing physically connecting him to it. To look into what a colorable claim is, it's also worthwhile to look at Edwards here. Edwards is an interesting case in that the court found one of the affidavits to be newly discovered but said that it wasn't conclusive because the petitioner couldn't set forth a colorable claim of actual innocence. In Edwards, the petitioner was found guilty of murder based on accountability, and the one newly discovered affidavit was from a co-defendant who didn't come forward earlier out of fear of self-incrimination. And he said that the defendant was there at the scene of the crime, but that he didn't actually participate in the crime. And the Edwards court found that that couldn't change any result on retrial because he was found guilty under accountability. So if he's there, if the affidavit is saying that he was there, that actually helps the state. That doesn't help him at all. What we have here is quite different. What we have here is really a true classic actual innocence claim where these people are coming forward saying that they saw someone else do it. And again, it's essential to stress here that all Adams is asking for is leave to file. He's not asking for an evidentiary hearing. He's not asking for a new trial. Those are so far down the road. He still has to go to the second stage to make a substantial showing and then go on further from there. So looking only at what is on the paper, it is clear that based on the petition and the supporting documents, taking them as true as a matter of law, that what these affidavits say present a colorable claim of actual innocence. I think we haven't really reserved any time. Okay. Thank you very much. Well, for these reasons, we ask that you allow Adams leave to file his petition. Morning. May it please the Court. Assistant State's Attorney Brian Hodes on behalf of the people of the State of Illinois. I'm sorry. I didn't hear your last name. And that doesn't... Oh, I'm sorry. Hodes. H-O-D-E-S as in Sam. Thank you. Thank you. In this case, the defendant was convicted of the first degree murder of Rahma Baker, whom he beat to death with a knife. The verdict was based on eyewitness testimony provided by defendant's close friends and family, along with an order of protection that had been entered against the defendant with respect to the victim. The order of protection, in turn, was based on evidence that the defendant, about two weeks before the murder, had beaten the victim. In this case, the defendant did not set forth a colorable claim of actual innocence as required by Edwards, which provides the analytic framework for analyzing whether leave to file a successive petition should be granted, predicated on allegations of actual innocence. Defendant's three affidavits do not constitute newly discovered evidence of actual innocence for this purpose because defendant did not meet his burden. He had to establish that they were newly discovered and that he exercised due diligence in obtaining them over the years that elapsed between his trial and the submission of the affidavits. The affidavits, along with defendant's other submissions, in other words, his petition for leave to file and his proffered petition itself, contained merely conclusory allegations, as the trial court recognized. Such conclusory allegations and assertions are not sufficient under the standard enunciated by Edwards and are not sufficient to lift the bar against raising successive petitions against post-conviction, successive post-conviction petitions alleging actual innocence. The defendant has to do more than merely assert. He has to show. And he has to make such a showing by providing dates and explaining exactly what it was he did. Counsel, I have a question. With regards to newly discovered, they argue that two of the witnesses, at least, in the affidavits, were unavailable. One was outside in mainland United States and the other one was in fear of her life. So once he discovered her, isn't that considered newly discovered evidence? The defendant has to show diligence. He can't just show that these people were out of the box. One of the witnesses... I'm sorry. I just need to interrupt you for a moment. And I didn't mean to interrupt you in the middle of a sentence. But doesn't the defendant say he didn't know about these people? They came forward. And when they came forward, then he got their affidavits. He couldn't have known about them until they came forward. I think that that's probably implied by their affidavits. He just says that he was diligent. He doesn't say what he was doing to look for these people. He doesn't even explain... If he doesn't know they exist, how could he be looking for them? That's what my problem is. I agree, Your Honor. He doesn't explain any of the gaps, and they barely explain the gaps between the time of trial and... What case says that he has to explain the gaps? Can you give me the citation of such a case? I think that the general rule, which is provided by Edwards... No, I don't think there is any. Due diligence is what due diligence is. If he didn't know about it and he finds out about it, how could you say he wasn't duly diligent? It doesn't say when he found... But what case holds that he has to say when? You know, these affidavits are affidavits that show that he wasn't aware of any of this information. Now he's aware of the information. And you say that the affidavits were conclusions. They set forth facts. How is this case any different than Ortiz, except in Ortiz the affidavits named who the murderer was? Here it doesn't, but it says he wasn't the murderer. Shouldn't this man be given at least the right to be able to file such a thing? I don't think that he provided ample detail. Even in the affidavits, they don't provide ample... What ample detail was missing? Show me. Well, actually, the burden is on the defendant to show that there was diligence. We have essentially these two people at indeterminate times, again, indeterminate, decided to come forward. We don't know what or when these times were. We know that one of them was in California for some of this time, no dates to speak of except that he was in California for two years. A few years. A few years, and that when he returned, he heard that the defendant, who he didn't know, but he'd seen playing basketball. It isn't clear that he played basketball with him, just that he'd seen him at some point playing basketball and knew that his nickname was Tay, and that he knew that Tay, based on what happened many years earlier, wasn't the murderer based on the fact that he drove by. And we're not judging the credibility of the affidavit at this stage, but Mr. Williams said he witnessed the murder. It wasn't the defendant. He didn't tell. He went to California. He came back. He found out the defendant was convicted. He still didn't tell, and now he's coming forward. You don't think that that is enough to show that the defendant didn't know until the man comes forward that he has this information, when he didn't know that the man was a witness at all. We are talking about just leave to file a successful petition, assuming for that purpose that this evidence might be credible. Assuming that. Okay. Even if we grant that the evidence showed ample diligence on the defendant's part in this case, it doesn't meet the other requirement, which is the colorable claim of actual innocence, which is essentially that no reasonable juror would have found, would have acquitted the defendant. That requires, frankly, some credibility determination, because it does require that the evidence. No, it doesn't. Well, I think it requires that the evidence be weighed, the evidence proffered by the new affidavits be weighed against the evidence that was produced at trial. And the evidence that produced at trial in this case was very, very powerful. It told a clear, coherent story, and it was provided by defendant's friends and relatives. It accounted for why the murder weapon was gone, and it even included a rather harrowing description of how, provided by one of defendant's brothers, about how defendant bashed this woman's skull in because he didn't want her to be on this street where defendant's mother lived that night. Yeah, I can't, I don't have all the facts in my head right now, but I thought that most of the witnesses basically forgot what happened or recanted and then they had to be impeached through their grand jury testimony, and so you had the evidence come in as substantive evidence based upon the state's attorneys testifying to what they previously said before the grand jury. And then in contrast to that, you now have two people who clearly are newly discovered. One, maybe not newly discovered, but two that are clearly newly discovered who say someone else other than the defendant committed the crime. That seems to be a claim, a colorable claim of actual innocence, and I'm missing why you don't think that that is a colorable claim, if credible, if found to be credible. I think it may be an arguable claim which would survive at the first stage if this were his first PC. It isn't. You wouldn't know. I mean, that's the law. I don't know if you would know. The law is, under Edwards, that the standard requires something more than that. It's no longer arguable, it's colorable, which means it has to be weighed against the evidence that was adduced at trial. You know what the law is? The law is that a person who is innocent should not be convicted. And if there's evidence to show that he's innocent, then that evidence should be revealed. There are so many innocent people over the years that I have been a lawyer and a judge who have been convicted wrongfully, where the state's attorney's office has prosecuted people that should never have been prosecuted. When we leave this earth, we do not want a debate at the gate. Our job is to make it right. So if there is a showing here or even an allegation where there's an innocent person, we have to look at that. We do have to look at it, and I agree, Your Honor. But I think that if we look at it within the proper standard enunciated by Edwards, the defendant doesn't meet that standard, doesn't make a colorable claim. Well, I don't know what standard that you're thinking about, but the standard that I see is much different than the one that you're talking about. Then we disagree as to how to read Edwards, and there's nothing that will separate that. But our position is that under Edwards, the trial court properly denied defendant leave to file his successive petition for post-conviction relief. And I might add that that doesn't internally shut the door to him as to bringing a claim of actual innocence. If that's the court's concern here, he can do that. He can provide more detail. That's essentially what happened in Ortiz. He provided more detail, and he was then allowed to file a successive PC. It was his third or fourth, I believe. But in this case, under these facts, based on Edwards, which is the law in this area, and Edwards isn't an outlier. It's based on a U.S. Supreme Court decision in Schlup. This court should affirm the denial of leave to file defendant's successive petition for post-conviction relief. Thank you, Your Honors. Thank you. Thank you. Ms. P, you're going to have just a couple of minutes. Unless you think you don't need it. I never am that confident. I think it's worth saying, one, opposing counsel said that Edwards provided more after an evidentiary hearing. There was an evidentiary hearing in that case where credibility was weighed, witnesses were called. We are not at that stage. Also, counsel said that the standard in Edwards is that no reasonable juror would have convicted him. That is not the standard. The standard is that the petitioner must merely raise the probability that it is more likely than not that no reasonable juror would have convicted him. Counsel is jumping ahead beyond what's required even at the second stage. The second stage is a substantial showing. Here we don't even have a substantial showing. That's not even required. We raise the probability that it is more likely than not. That is all. Thank you very much. Thank you. Excuse me. Can you just, we're going to break for just a couple of minutes. We'll be right back.